UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Donald Franks,                                                          Civil No. 13-2904 (MJD/FLN)

                 Plaintiff,

        v.                                                       **REPORT AND**
                                                                       **RECOMMENDATION**
Carolyn W. Colvin,
Acting Commissioner of Social Security,

                 Defendant.

_____

Nicole Kim, William Morrison, and Edward Olson for Plaintiff.
Ann Bildtsen, Assistant United States Attorney, for Defendant.

_____

Plaintiff Donald Franks seeks judicial review of the final decision of the Acting Commissioner of Social Security ("Commissioner"), who denied his application for disability insurance benefits. The matter was referred to the undersigned United States Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claim pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment. ECF Nos. 15 and 18. For the reasons set forth below, the Court recommends that the Commissioner's motion be **GRANTED** and the Plaintiff's motion be **DENIED.**

## I.  INTRODUCTION

Franks filed an application for disability insurance benefits on December 5, 2010, alleging an onset date of April 10, 2009. Administrative Record [hereinafter "AR"] 126, ECF Nos. 10 and 11. Franks's application was denied initially and again on reconsideration. AR 131, 137. After holding an administrative hearing on May 30, 2012, Administrative Law Judge ("ALJ") Lisa Groeneveld-Meijer denied Franks's application for disability benefits. AR 32. On August 28, 2012,

the Appeals Council denied Franks's request for review, rendering the ALJ's decision final for purposes of judicial review. AR 1–3; *see* 20 C.F.R. § 404.981. Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Franks commenced this civil action on October 21, 2013, seeking reversal of the ALJ's decision or, alternatively, a remand for further proceedings. Compl., ECF No. 1.

## II.  STATEMENT OF FACTS

### A.    Background

Franks was born on February 16, 1963 and was 47 years-old when he filed his application for disability insurance benefits on December 5, 2010. AR 187. He claims benefits should be awarded from April 10, 2009 (his alleged onset date) until December 31, 2011 (his date last insured). AR 126. Franks argues that the following conditions limit his ability to work: back, neck, shoulder, and wrist pain; nerve damage in his legs; high blood pressure; sleep apnea; depression; and an enlarged heart. AR 237. His past relevant work experience includes jobs in banking, golf course management, office management, car sales, and law enforcement. AR 63–68.

### B.    Medical Evidence

#### 1.    Franks's Medical Procedure History

In 1982, Franks suffered an acromioclavicular ("AC") joint separation injury to his shoulder while in the army. AR 743. He then injured his back in 1987 while playing football. *Id.* In 2000, Franks was involved in a rear-end motor vehicle accident that resulted in complex cervical problems. AR 1110.

Franks underwent numerous back surgeries in 1998, 2000, and 2002, including one lumbar fusion. AR 743. A February 2007 lumbar MRI showed that:

> Vertical rods with pedicle screws have been placed posteriorly from L4 to the sacrum in this patient with 5 nonrib bearing lumbar type vertebrae. Metallic densities and

> calcification at both L4–L5 and L5–S1 interspaces. There appears to be a partial
> laminectomy at L4 on the left.

AR 507. The MRI also indicated that Franks suffers from degenerative disc disease. AR 507–08.

In February 2007, an x-ray of Franks's left shoulder showed "deformity and corticated ossific densities at the acromioclavicular joint likely the result of old trauma. Poorly defined soft tissue masses are suggested on the transscapular view overlying the left scapula." AR 508. A second x-ray taken a year later revealed that these issues remained unchanged. AR 506. This x-ray also showed that his left shoulder joint appeared normal. *Id.* Later that year, however, Franks underwent an AC joint surgery on his left shoulder. AR 743.

A January 2011 cervical MRI indicated:

1. Cervical spondylosis with multilevel central canal narrowing.
2. At C6–C7 disc bulge osteophyte complex flattens central surface of the spinal cord. Moderate central canal and right foraminal stenoses at this level.
3. At C5–C6 there is moderate stenosis of the right neural foramen.

AR 501–02.

On April 11, 2011, Franks underwent a cervical facet nerve radiofrequency neurotomy. AR 784. This reduced the pain in his neck and shoulder for approximately six months, but his symptoms returned thereafter. AR 1111.

### 2.    Medical Opinion Evidence

#### a.    Mental Assessments of Franks

Licensed psychologist Steven Carter conducted a mental consultative exam of Franks on March 28, 2011. *See* AR 751–58. He concluded that Franks was able to understand and retain instructions; carry out both simple as well as detailed instructions; maintain attention and concentration for at least two straight hours; sustain an ordinary routine without supervision; work

3

in coordination with or in proximity to others without being distracted; complete a normal workday and work week without interruptions from psychologically based symptoms; interact appropriately with the public or customers; and respond to unruly, demanding, or disagreeable customers or coworkers. AR 756–57. Carter did opine, however, that Franks was unable to perform at a consistent rate without an unreasonable number of rests, due to fatigue and ongoing pain. AR 756.

On April 6, 2011, B. Johnson, Ph.D., conducted a psychiatric consultative exam on Franks. AR 767. At this consultation, Franks reported that he was able to care for his pet, prepare simple meals, do laundry and other household chores, complete yard work, drive, shop, and manage finances. AR 779. Based on his examination, Johnson determined that Franks had mild limitations on his ability to do daily living activities; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, and pace; and no episodes of decomposition. AR 777. Therefore, according to Dr. Johnson, Franks's impairments were not severe. AR 767. He also noted that Franks was able to understand and remember short and simple instructions, maintain attention and concentration for at least two hours, and complete a normal workday and workweek without interruptions. AR 779. Dr. Johnson concluded his report by opining that Franks's report of his pain symptoms was only partially credible, as he described daily activities that were not significantly limited in relation to his alleged symptoms. *Id.*

### b.    Physical Assessments of Franks

On March 9, 2007, Dr. James Stevenson, a Minnesota Disability Determination Services physician, conducted a consultative physical RFC assessment of Franks. AR 939. Dr. Stevenson determined that Franks could occasionally lift up to twenty pounds; frequently lift up to ten pounds; stand for six hours per workday; and sit for six hours per workday. AR 940. Dr. Stevenson indicated

that due to Franks's back pain and prior surgeries, his ability to push and/or pull with his upper and lower extremities was limited. AR 940.

Dr. Peter Marshall conducted a general medical examination of Franks at the Minneapolis VA hospital on June 19, 2007. AR 424. He determined that Franks was limited to lifting twenty pounds occasionally and forty pounds maximum. AR 431. He also believed Franks should limit himself to only occasional bending and twisting and refrain from lifting anything over his head. AR 431–32. Dr. Marshall opined that Franks should not do any overhead lifting, and he should only occasionally lift objects with his left shoulder. AR 432. Although Dr. Marshall believed Franks could not perform his prior work as a police officer, he did believe Franks could perform sedentary and light work with the above limitations. *Id.*

On March 18, 2011, Dr. Neil Johnson conducted a consultative medical evaluation of Franks, where he concluded that Franks suffered from severe pain syndrome. AR 747. Franks's neck and back were tender and pain made it difficult for Dr. Johnson to complete the examination. *Id.* Dr. Johnson did not, however, find any evidence of nerve root irritation. *Id.* Dr. Johnson also observed that Franks appeared depressed. *Id.*

A physical RFC assessment of Franks was conducted on March 30, 2011, by Dr. Gretchen Niemioja, a Minnesota Disability Determination Services physician. *See* AR 759–66. While Franks was able to ambulate around the room without using a cane during the examination, he did so in pain. AR 766. Dr. Niemioja observed that Franks had pain in his neck, back, and left shoulder; moderate difficulty with heel and toe walking; and severe difficulty squatting. *Id.* She also noted that his range of motion was severely limited in cervical extension and significantly limited in cervical rotation. *Id.* His sensory and motor strength in his arms and legs, however, appeared to be intact. *Id.*

Based on her examination of Franks, Dr. Niemioja determined that he was able to occasionally lift up to twenty pounds; frequently lift up to ten pounds; stand for at least two hours per workday; sit for six hours per workday; push/pull without limitations; and occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. AR 760–61. Additionally, Dr. Niemioja opined that Franks should avoid all machinery due to his limited range of motion in his neck, and he should never climb ladders, ropes, or scaffolding. AR 761, 763. Finally, she observed that while Franks had limitations on his reaching ability (including overhead reaching), he had no other manipulation (e.g., handling, fingering, feeling), visual, or communication limitations. AR 762–63.

Dr. Niemioja concluded her assessment of Franks by noting that while Franks's impairments could reasonably be expected to produce his alleged symptoms, "the intensity of the symptoms and their impact on functioning are not consistent with the totality of evidence. [Franks's] alleged symptoms/limitations are greater than [what was] consistent with evidence in [his medical records]." AR 764.

On July 25, 2011, Dr. Stefan Kaiser conducted a consultative disability evaluation of Franks. AR 1117. In his report, Dr. Kaiser stated that he believed Franks's representations as to his pain may be motivated by monetary gain. AR 1122. Kaiser observed, "[A]lthough the patient states significant left lower extremity symptoms and back pain on his exam, he clearly has intact function; however, he exhibited signs of symptom magnification (if not frank malingering) during the exam." *Id.* Dr. Kaiser questioned why Franks had not received aggressive diagnostic imaging or treatments if the pain was as severe and limiting as Franks claimed. AR 1123. Dr. Kaiser concluded that motivation was a factor in Franks's inability to find work, as Franks did not have any significant limitations that would preclude him from seeking competitive employment. *Id.* Nevertheless, Dr. Kaiser

recommended the following restrictions: lifting no more than thirty pounds, limit pushing/pulling to no more than forty pounds, and avoid overhead reaching and climbing. *Id.*

Dr. James Montana, one of Franks's treating physicians, submitted a letter on September 13, 2011 in support of Franks's application for disability benefits. AR 878. Dr. Montana indicated that he had treated Franks since 2003, and Franks suffered from chronic neck and back pain as well as lumbar and cervical spondylosis. *Id.* Due to these conditions, Dr. Montana opined that Franks was not employable. *Id.* On September 22, 2011, Dr. Jeffrey Wilt, another treating physician, submitted a near identical letter in support of Franks's application. AR 880. Like Dr. Montana, Dr. Wilt believed that Franks was not employable due to his lumbar and cervical spondylosis. *Id.*

Finally, on September 19, 2011, Charlotte Ackerley, a close friend of Franks, wrote a letter in support of Franks's application for disability benefits. AR 879. Ackerley indicated that she helps Franks with household chores (e.g., cleaning, laundry, and making beds). *Id.* Her son also helps Franks with lawn care, snow removal, and other heavier jobs. *Id.* She noted that Franks is unable to sit for long periods of time without getting extremely sore and stiff. *Id.* She also stated that Franks has difficulty walking due to his back pain and some numbness in his left foot. *Id.* According to her letter, Ackerley massages Franks's legs, back, shoulders, and neck almost nightly in order to relieve muscle soreness. *Id.*

## C.     The Administrative Hearing

The administrative hearing was held on May 30, 2012. AR 32. Franks was represented by counsel and testified on his own behalf. *Id.* A vocational expert also testified at the hearing. *Id.*

### 1.     Franks's Testimony Regarding Pain and Daily Activities

Franks testified that due to his back injury and subsequent lumbar fusion, he has pain and

limited mobility in his back. AR 68–69. He stated that his back pain makes it difficult for him to sit or stand for extended periods of time—he can usually only stand between ten and fifteen minutes before it becomes problematic. *Id.* According to Franks, this pain also makes driving a vehicle challenging, and therefore he limits his driving to approximately two hours per week. AR 71–72. Franks also claimed to have daily back spasms and some paralysis in his left leg. AR 69, 76–77.

With regards to his neck pain, Franks stated that it has continually worsened since his car accident in 2000. AR 72. He was told by Dr. Montana that the discs in his neck were pushing on his spinal column and nerves were coming out of his neck at multiple levels. AR 73. He said he has undergone five or six neurotomy procedures to help manage the pain, but these procedures only provide temporary relief. *Id.* As to Franks's shoulder pain, Franks stated that his left AC joint has been cut in half, which causes him daily pain. *Id.* To manage this pain, Franks reported receiving steroid injections. *Id.*

According to Franks, his pain can be very inconsistent—some days he is in pain from the moment he wakes up, and other days he will feel good for a few hours. AR 68. He indicated that he typically has more bad days than good days. AR 70. On a good day, Franks testified that he could stand for about four hours during an eight hour workday, but he would need breaks every half hour. *Id.* He believed he has only four good days each month. *Id.*

Franks stated that he has trouble lifting objects because of the pain in his neck and opined that at most he could lift a twenty pound bag of cat litter. AR 87. Franks did state, however, that he is able to bend over to pick up his cat, take the garbage out, and bring bags of groceries into the house. AR 880.

Franks also provided testimony regarding his daily activities. Although Franks prepares

meals for himself, they are usually meals he is able to cook in the microwave. AR 79. He stated that

unloading the dishwasher can be cumbersome for him, and his friend Charlotte Ackerley usually

takes care of his laundry. *Id.* Franks also has difficulty tying his shoes. *Id.* He did state, however,

that he is able to run the vacuum cleaner, go shopping, and occasionally mow his lawn. *Id.* Franks

also testified that he routinely goes fishing with friends every few weeks. AR 83. He can only stay

out for a short period of time, however, because the swaying motion of the boat hurts his neck. AR

84. He indicated that his neck pain is making it harder to fish, and he does not do it as much as he

used to. *Id.*

### 2.      Vocational Expert's Testimony

After Franks's testimony, the ALJ posed the following hypothetical to the vocational expert

(VE):

> Assume an individual between the ages of 46 and 49 with the claimant's education
> and work experience, who can lift up to twenty pounds occasionally; lift and carry
> up to ten pounds frequently; stand and walk for about two hours; sit for up to six
> hours in a normal eight hour workday with normal breaks (two fifteen minute breaks
> and a thirty to sixty minute lunch break); sit/stand one to two times per hour as
> needed; occasionally operate foot controls; never climb ladders, ropes, or scaffolds;
> occasionally use ramps or stairs, stoop, kneel, crouch, crawl, and balance; never do
> overhead work; never do work that includes potential hazards, unprotected heights,
> uneven terrain, or moving machinery.

AR 93–94.

The VE testified that such an individual could perform the claimant's past jobs of a

collections coordinator, office manager, and golf course manager. AR 94. The VE also provided

other possible jobs that matched the hypothetical, including a security guard and general clerical

jobs. The VE stated that there were approximately 2,500 security guard jobs and 40,000 general

clerical jobs in Minnesota. AR 94. The VE testified that such an individual could also perform

unskilled work, including work as a Cashier II. Additionally, the VE provided examples of light exertional jobs which could be performed by the hypothetical individual, including a hand packager, an office helper, and a small product assembler. AR 95. The VE stated that there were 6,400 hand packager jobs, 7,000 office helper jobs, and 8,000 small product assembler jobs available in Minnesota. AR 94.

The ALJ then changed the hypothetical, reducing the hypothetical individual's maximum lift/carry restriction from twenty pounds to ten pounds occasionally. AR 95. The VE indicated that such an individual could not perform the claimant's past relevant work. AR 47–48. The VE testified that such an individual could, however, work sedentary, unskilled occupations such as an electronics worker, an optical assembler, or a general assembler. AR 95. The VE reported that there were approximately 4,000 electronics worker positions, 1,500 optical assembler positions, and 4,000 general assembler positions available in Minnesota. AR 95.

The ALJ then questioned if such jobs would allow an individual to get up and walk around the work station once every hour for three minutes. AR 95–96. The VE responded that such jobs would in fact allow an individual to get up and walk around twice each hour if he maintained his productivity. AR 96. The VE indicated that the maximum time off task tolerated by such jobs would be no more than ten percent of the workday. *Id.*

Finally, the ALJ also asked if the jobs mentioned by the VE would allow a worker to take an extra unscheduled break, in addition to his normal breaks, to use the restroom or make a phone call. *Id.* The VE responded that the clerical positions would allow for up to two additional brief breaks and the production jobs would allow for one additional break up to five minutes. *Id.*

The VE also testified that the standard for absenteeism in these positions would be no more

than twice per month. AR 97. Exceeding this limit, the VE stated, would erode all of the available positions for such a hypothetical person. *Id.*

**D.    The Commissioner's Decision**

On June 28, 2012, the ALJ issued a decision denying benefits. In determining that Franks was not disabled, the ALJ followed the five-step sequential process established by the Social Security Administration ("SSA"), outlined in 20 C.F.R. § 404.1520.

The first step in the sequential evaluation is to consider the claimant's work history to determine whether he has engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). If the claimant has performed substantial gainful activity, he is not disabled. *Id.* At step one, the ALJ found that Franks had not engaged in any substantial gainful activity since April 10, 2009, the alleged onset date. AR 34.

The second step in the sequential evaluation is to determine whether the claimant has a severe impairment that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii), .1520(c). At step two, the ALJ found that Franks had the following severe impairments: depression, degenerative disc disease, left shoulder impingement, and degenerative joint disease of the lower extremities. AR 34.

The third step in the sequential evaluation requires the ALJ to determine whether the claimant has an impairment that meets or equals one of the listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii), .1520(d). At step three, the ALJ determined that Franks did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1. AR 35–38.

If the claimant's impairment does not meet or equal one of the listings in Appendix 1, then

the ALJ must make an assessment of the claimant's RFC. Here, the ALJ concluded that Franks had

an RFC to perform sedentary work with the following restrictions:

> a sit/stand option one to two times per hour as needed; only use foot controls occasionally; never climb ladders, ropes, or scaffolds; occasionally perform other postural activities such has climbing ramps or stairs, stooping, crouching, crawling, and balancing; no overhead reaching; no work around potential hazards such as unprotected heights or dangerous machinery; and limited to unskilled employment.

AR 38. In making this determination, the ALJ placed considerable weight on the opinions of the

state-agency physicians and psychologists who reviewed this matter. AR 44–47. The ALJ, however,

placed limited weight on the opinions of Dr. Montana and Dr. Wilt, Franks's treating physicians,

finding that the record as a whole was not supportive of the degree of limitations the doctors

described. AR 46–47.

In the fourth and fifth steps of the sequential evaluation process, the ALJ must determine

whether the claimant has the RFC to perform either his past relevant work or any other jobs that

exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4)(iv)–(v). If the ALJ

determines that the claimant can still perform his past relevant work the ALJ will find that the

claimant is not disabled. If the claimant cannot perform his past relevant work, then the "burden

shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds

of work, and, second, that other such work exists in substantial numbers in the national economy."

*Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

At step four, the ALJ found that Franks was not able to perform his past relevant work as a

bank loan officer, golf course manager, car salesperson, corrections officer, and bill collector. AR

47–48. This was based on the VE's opinion that an individual of Franks's age with his education,

past relevant work experience, and RFC would be unable to perform any of Franks's past relevant

work. AR 48.

At step five, however, the ALJ concluded that considering the Franks's age, education, work experience, and RFC, there were a significant number of jobs available in the national economy that Franks could perform. AR 48. This conclusion was based on the testimony of the VE, which the ALJ found consistent with the information contained in the Dictionary of Occupational Titles. AR 49.

Based on the ALJ's findings at step five that there were adequate jobs available to Franks, the ALJ denied Franks's application for disability insurance benefits. AR 50.

### III.  STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989) (citing *Universal Camera Corp. v. NLRB.*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts*, 222 F.3d at 468 (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. Therefore, this Court's review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

## IV. CONCLUSIONS OF LAW

Franks raises three issues in his motion for summary judgment. First, Franks claims that the ALJ failed at step three to properly consider whether he met the "disorder of the spine" impairment

14

listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.04 [hereinafter "Listing 1.04"]. Pl.'s Mem.

in Supp. of Mot. for Summ. J. 4, ECF No. 15. Second, Franks claims the ALJ failed to properly

evaluate his RFC. *Id.* Finally, Franks claims that the ALJ failed to properly evaluate his credibility.

*Id.* After a review of the entire record, this Court concludes that the ALJ's findings at each step of

the sequential analysis were supported by substantial evidence in the record as a whole.

**A.     Substantial evidence supports the ALJ's determination that Franks's impairments did not meeting Listing 1.04**

Plaintiff argues that the ALJ erred at step three because the objective evidence of his spinal

impairments is such that he should be found disabled under Listing 1.04. *See* ECF No. 15 at 9. The

listings set out in Appendix 1 describe various physical and mental illnesses and abnormalities, and

each are defined in terms of specific medical signs, symptoms, and/or laboratory test results. *See*

*Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

At step three, the claimant bears the burden of proving that his impairments meet or equals

a listing. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004)."Merely being diagnosed with

a condition named in a listing and meeting some of the criteria will not qualify a claimant for

presumptive disability under the listing. An impairment that manifests only some of [the listing]

criteria, no matter how severely, does not qualify." *McCoy v. Astrue*, 648 F.3d 605, 611–12 (8th Cir.

2011) (citing *Sullivan*, 493 U.S. at 530).

Listing 1.04 states:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
With:

    A.     Evidence of nerve root compression characterized by neuro-anatomic

> distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. pt. 404, subpt. P, app. 1. Therefore, to be disabled under Listing 1.04, the claimant must suffer from a disorder of the spine and show evidence of nerve root compression.

The ALJ determined that Franks's impairments did not meet the narrow definitions outlined in Listing 1.04. Specifically, the ALJ stated, "The severity of Listing 1.04 requires a spine disorder . . . resulting in compromise of a nerve root . . . . There is no evidence the claimant has compromise of a nerve root. Therefore, the claimant has not satisfied the requirements of this listing." AR 36.

Franks argues that, contrary to the ALJ's finding, he does suffer from nerve root compression. ECF No. 15 at 10. This is evidenced, Franks claims, by his radiculopathy diagnosis, his multiple radiofrequency neuroablation procedures, and the fact he has undergone a neurotomy. ECF No. 15 at 10; *see also* AR 731, 786–87, 1059. Franks also cites to Dr. Neil Johnson's inability to conduct a straight leg test in support of his argument. ECF No. 15, at 10; *see also* AR 744.

None of the evidence cited by Franks, however, meets the requirements under Listing 1.04. Assuming, for arguments sake, that Franks's impairments constitute a "disorder of the spine," he has not produced any evidence of nerve root compression. In fact, a doctor's review of the January 2011 MRI indicated that there was no sign of nerve root compression. *See* AR 818 ("Cervical MRI reviewed. It demonstrates moderate [degenerative disc disease] at C5/6 and at C6/7. No spinal cord or nerve root compression.").

Additionally, the fact that Franks was diagnosed with radiculopathy does not necessarily mean he suffers from "nerve root compression." Radiculopathy is defined generally as a "disorder of the spinal nerve roots." Stedman's Medical Dictionary (27th ed. 2000), *available at* Westlaw

16

STEDMANS 347610. Franks has not cited any medical records or other evidence that equates radiculopathy with nerve root compression. Moreover, at least one court has specifically refused to recognize that radiculopathy is not synonymous with nerve root compression. *See Stakely v. Astrue*, No. 11-CV-01455, 2012 WL 5878341, at *4 (D. Colo. Oct. 30, 2012) (stating that "the term 'radiculopathy' is not synonymous with nerve root compression; it broadly describes a disorder or disease of a nerve root").

Therefore, the Court finds that substantial evidence existed in the record to support the ALJ's determination that Franks did not have an impairment that met Listing 1.04.

## B.     The ALJ did not err in determining Franks's RFC

Franks contends that the ALJ improperly weighed the medical evidence in determining his RFC. ECF No. 15 at 11. Specifically, he argues that the ALJ erred in only affording "very little weight" to the opinions of his treating physicians Drs. James Montana and Jeffrey Wilt while affording "significant weight" to the opinion of consultative examiner Dr. Steven Carter, Psy.D. ECF No. 15 at 11–13.

### 1.     Substantial evidence supports the weight assigned to the medical opinions of Dr. Montana and Dr. Wilt

"[A] treating physician's opinion is given controlling weight if it is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005); *see also* 20 C.F.R. § 404.1527(c)(2). A treating physician's opinion, however, does not automatically control since the record must be evaluated as a whole. *Id.* An ALJ may discount or disregard "the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the

credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).

Franks submitted letters of support from both Dr. Montana and Dr. Wilt. *See* AR 878, 880.

Dr. Montana's letter stated, in relevant part:

> Don has chronic neck and back pain, which has been evaluated extensively over the years. He has had a lumbar fusion, which has not completely resolved his chronic low back pain. He has chronic neck pain, which is going to be scheduled for a fusion procedure at the VA Medical Center in Minneapolis in the next several months.
>
> It is my opinion that the Don's [sic] lumbar and cervical spondylosis and pain associated with this disorder prevents him from being able to be employed. I would support Don's application for Social Security Disability.

AR 878. Dr. Wilt's letter, which was nearly identical to Dr. Montana's, stated in relevant

part:

> Mr. Franks has chronic neck and back pain, which has been evaluated extensively over the years. He has had a lumbar fusion, which has not completely resolved his chronic low back pain. He has chronic neck pain, for which I recently referred him to neurosurgery at Essential [sic] Health.
>
> It is my opinion that the Don's [sic] lumbar and cervical spondylosis and pain associated with these disorders prevent him from being employable. I support Don's application for Social Security Disability.

AR 880.

The ALJ gave similar reasons for only affording little weight to the opinions of Dr. Montana and Dr. Wilt. First, the ALJ stated that it was not clear what kind of training either doctor had and whether their opinions regarding Franks's inability to work were within their expertise. AR 47. Second, the ALJ found that there were no treatment records from either doctor that supported the limitations outlined by the doctors' letters. AR 47. Finally, the ALJ determined that Franks's own testimony contradicted the limitations Drs. Montana and Wilt placed on him. AR 47.

Franks argues that because the ALJ is under an affirmative obligation to develop the record,

she "should have gone out for a copy of their curriculum vitae" if she had concerns about their training. ECF No. 15, at 12. Additionally, Franks argues that the ALJ did not provide an individualized assessment of each doctor's written opinion as the two paragraphs of the ALJ's decision relating to each doctor's opinion were nearly identical. *Id.*

An ALJ is not required to give the opinions of treating doctors controlling weight if their opinions are not supported by the record. *See Prosch*, 201 F.3d at 1013. Plaintiff has not directed this Court to specific medical records completed by Drs. Montana and/or Wilt during the time frame of alleged disability that are consistent with their opinions that Franks's impairments keep him from working. After conducting an independent review of the record, it appears that there are only a few medical records from either doctor pertaining to Franks's impairments between April 10, 2009 and December 31, 2011.

The record shows two visits with Dr. Montana during Franks's alleged time of disability. *See* AR 312, 1168. Franks visited Dr. Montana on May 11, 2009 complaining of neck pain. AR 312. Dr. Montana noted that his pain was confined to his neck and back and that he was not having any radicular symptoms. AR 313. He also indicated that while Franks had tenderness along the right and left cervical facets, his range of motion was not limited, and he appeared physically fit. *Id.* Finally, he observed that Franks's upper and lower extremity strength and reflexes were normal. *Id.* At this appointment, Franks requested that Dr. Montana complete a disability examination for him, but Dr. Montana refused to do so. AR 318. Franks also visited Dr. Montana on December 30, 2011 after he twisted his knee. AR 1168. His neck and back pain were not discussed during this visit. *Id.*

As to Dr. Wilt's treatment of Franks, the record indicates that Franks's first visit was on October 30, 2007. AR 1040. At this appointment, Dr. Wilt indicated that Franks had "a history of

lumbar surgery, cervical surgery and essential failure of lumbar surgery." AR 1041. He assessed Franks with "chronic pain management, degeneration of the lower back and cervical spine." *Id.* Dr. Wilt noted, however, that Franks was "quite active"—he golfed in the summer, rode a snow machine in the winter (while wearing a back brace), coached for the swim team, and continued to swim occasionally. *Id.*

On July 8, 2011, Franks visited Dr. Wilt complaining of sinus pain and throat trouble. AR 1124. He also requested that Dr. Wilt conduct a disability exam after Dr. Montana refused to complete an assessment for him. AR 1125. Other than treating him for the sinus problems, Dr. Wilt's records do not address any back or shoulder pain issues. *See generally* AR 1124–25. He did, however, refer Franks to occupational medicine for disability questions. AR 1125.

Finally, Franks saw Dr. Wilt on September 22, 2011, indicating he was having neck problems. AR 1115–16. Franks again asked Dr. Wilt to write a statement of his disability. AR 1115. Franks brought an MRI report with him, which Dr. Wilt stated showed "moderate central canal and right foraminal stenosis at C3, and moderate stenosis of the right neuroforamen at C5–C6." *Id.* Although his notes state that he did not believe Franks was employable, his records did not offer any reasons for this conclusion. *See generally* AR 1115–16.

The only other visit with Dr. Wilt in Franks's medical records was a December 2010 emergency room visit where Franks complained of chest pain. AR 377–78. Franks was treated and discharged, and the records of the visit indicate no discussion of neck or back pain. *See generally* AR 377–78.

While these medical records show some evidence of back and neck pain, they do not contain any limitations that are consistent with Drs. Montana and Wilt's opinions that such pain is so severe

that Franks is unable to work. Drs. Montana and Wilt's opinions are also not consistent with the record as a whole, as numerous medical professionals providing consultative exams opined that Franks was able to work. *See, e.g.*, AR 759–66 (Dr. Niemioja opined Franks could do light work); AR 939–46 (Dr. Stevenson opined Franks could do light work); AR 1117–23 (Dr. Kaiser opined that Franks had no significant limitations that would preclude him from doing work). Finally, a doctor's conclusion that a patient is disabled or unable to work is not to be given controlling weight. *See Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work' . . . involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."); *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner].").

Therefore, because the letters of Drs. Montana and Wilt only contained conclusory opinions as to Franks's ability to do work and were not supported by the record as a whole, substantial evidence existed to support the ALJ's decision to afford little weight to the treating physicians' opinions regarding Franks's ability to work.

### 2. The ALJ did not err in the weight he afforded to Dr. Carter's opinion

Franks next argues that the ALJ erred in affording "significant weight" to the opinion of Dr. Steven Carter, a consultative examiner, because the ALJ's decision was partially based on the fact that Dr. Carter "had a history of completing examinations for the Social Security Administration, [and] he was familiar with [the] regulations and practices." ECF No. 15 at 12; *see also* AR 44.

21

Franks claims that it is legally inappropriate for an ALJ to afford increased weight to Dr. Carter's opinion simply because he is a consultative examiner. ECF No. 15 at 12.

Under the regulations, however, an ALJ may consider such information in determining how much weight to give a medical source's opinion. *See* 20 C.F.R. § 404.1527(c)(6) ("[T]he amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has . . . are relevant factors that we will consider in deciding the weight to give to a medical opinion."). Therefore, Franks's claim that considering Dr. Carter's history as a consultative examiner was legally inappropriate is unfounded.

### 3. The ALJ's decision complied with SSR 96-8p

Franks asserts that Social Security Ruling ("SSR") 96-8p requires the ALJ to separately consider the claimant's ability to sit, stand, lift, carry, push, and pull. ECF No. 15 at 13; *see also* SSR 96-8p ("Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately . . . even if the final RFC assessment will combine activities."). Because the ALJ's RFC determination did not explicitly address these seven "strength demands," Franks argues that remand is appropriate for proper consideration of his RFC. ECF No. 15 at 13.

In determining his RFC, the ALJ found that Franks had the capacity "to perform sedentary work[1] as defined in 20 C.F.R. [§] 404.1567(a)" with certain exceptions. AR 38. Courts have

---

[1]    "Sedentary work" is defined as

lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job

consistently held that an ALJ's failure to explicitly address every one of the seven "strength demands" is not fatal to the ALJ's decision. *See Depover v. Barnhart*, 349 F.3d 563, 567–68 (8th Cir. 2003) (finding that the ALJ did not err in failing to make explicit findings as to the claimant's ability to sit, stand, or walk when it was clear the ALJ did not overlook these abilities based on the hearing transcript and the written opinion); *Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009) ("Although the RFC assessment is a function-by-function assessment, . . . the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient.").

Here, although the ALJ's RFC determination did not explicitly and individually address Franks's ability to sit, stand, lift, carry, push, and pull throughout the course of an eight hour workday, the record is clear that the ALJ did consider these functions in formulating the RFC. First, the ALJ posed two hypotheticals to the vocational expert at the hearing, one based on sedentary work and the other based on light work. AR 93–97.[2] Each hypothetical was further limited by other restrictions, such as the option to sit/stand one to two times per hour, no overhead work, and no ability to climb ladders, ropes, or scaffolds. Thus, it is clear that the ALJ considered the claimant's

---

duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
20 C.F.R. § 404.1567(a).

[2]

Although not explicitly stated, it is clear that the ALJ's hypotheticals were based on the "light" and "sedentary" categories of work. The first hypothetical posed was based on the ability to lift up to 20 pounds occasionally and 10 pounds frequently. AR 93; *see also* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."). In the second hypothetical, the ALJ reduced the weight to 10 pounds occasionally. AR 95; *see also* 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time . . . .").

ability to sit, stand, walk, lift, and carry throughout a typical workday.

Second, the ALJ's opinion cited multiple doctors' opinions regarding the claimant's ability to sit, stand, walk, lift, carry, push, and pull. *See* AR 45 (discussing Dr. Niemioja's opinion that Franks could occasionally lift/carry up to twenty pounds, frequently lift/carry up to ten pounds, stand and/or walk for at least two hours in an eight hour workday, sit for six hours in a workday, and push/pull without limitations (citing AR 760)); AR 46 (discussing Dr. Stevenson's opinion that Franks could occasionally lift/carry up to twenty pounds, frequently lift/carry up to ten pounds, stand and/or walk for six hours in a workday, sit for six hours in a workday, and push/pull with only some limitations (citing AR 940)); AR 46 (discussing Dr. Kaiser's opinion that Franks was limited to lifting no more than thirty pounds, pushing/pulling no more than forty pounds, no climbing or overhead work, and using a cane for ambulation (citing AR 1123)).

All of the aforementioned opinions were included in the ALJ's written decision. Therefore, although the ALJ did not specifically address Franks's ability to sit, stand, walk, lift, carry, push, or pull in the RFC, it is clear that the ALJ considered all seven "strength demands" in making her RFC determination. "A deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case." *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005). Therefore, the ALJ did not err in determining Franks's RFC by failing to explicitly address Franks's ability to perform the seven strength demands throughout the course of an eight hour workday.

## C. Plaintiff's credibility determination

Lastly, Plaintiff alleges that the ALJ failed to properly evaluate Franks's credibility. ECF No. 15 at 13. Plaintiff cites three specific errors. First, he claims that he was entitled to substantial

credibility because of his "admirable work history." *Id.* Second, he maintains that the ALJ wrongly

accused him of drug dependence. *Id.* at 14. Finally, he argues that the ALJ did not consider

numerous symptoms pursuant to SSR 96-7p. *Id.* at 15.

### 1.    Failure to directly address Franks's work history

In general, "[a] claimant with a good work record is entitled to substantial credibility when

claiming an inability to work because of a disability." *Nunn v. Heckler*, 732 F.2d 645, 648 (8th Cir.

1984). However, "[t]he ALJ may disbelieve subjective complaints if there are inconsistencies in the

evidence as a whole." *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005). An ALJ's credibility

determination will not be disturbed when the ALJ "considers, but for good cause expressly

discredits, a claimant's complaints of disabling pain." *Id.* Also, the fact that an ALJ does not

specifically address the claimant's work history during the credibility discussion is not error if other

substantial evidence supports the ALJ's decision. *See Fedje v. Barnhart*, No. 01-CV-780, 2002 WL

537648, at *2 (D. Minn. Apr. 9, 2002).

After conducting a lengthy evaluation of Franks's claims and comparing them to his medical

records, the ALJ stated:

> After careful consideration of the evidence, I find that the claimant's medically
> determinable impairments could reasonably be expected to cause the alleged
> symptoms; however, the claimant's statements concerning the intensity, persistence
> and limiting effects of these symptoms are not credible to the extent they are
> inconsistent with the above residual functional capacity assessment.

AR 43. After reviewing the relevant medical records, this Court finds that substantial evidence

existed in the record for the ALJ to conclude that Franks's claims were not entirely credible.

First, in a July 2011 consultative examination of Franks that was conducted at the request

of Dr. Wilt, Dr. Kaiser indicated that Franks had a history of chronic low back pain. AR 1122.

However, Dr. Kaiser also indicated:

> There is concern in my mind, based on the objective evaluation, that there may be a significant secondary gain motivator at play here. The reason for this concern is that although the patient states significant left lower extremity symptoms and back pain on his exam, he clearly has intact function; however, he exhibited signs of symptom magnification (if not frank malingering) during the exam. Although I do not doubt his symptoms of pain, I would question if the pain is so severe and the symptoms limiting, as to why he has not received aggressive diagnostic imaging or treatments for that remains to be seen. . . . On my evaluation, I do not necessarily find any significant limitations that would preclude him from seeking competitive employment. Certainly motivation seems to be a key factor here.

AR 1122–23. The ALJ stated that this observation diminished the credibility of Franks, as it indicates that he was not necessarily motivated to perform at full capacity, particularly when undergoing examinations that would impact his application for benefits. AR 43.

Secondly, the record indicates that despite Franks's claims of ongoing pain, he has been fairly active in his day-to-day life. In a consultative exam in March 2011, Franks indicated that he fished two to three times per week for two or three hours at a time. AR 754. At the hearing, Franks stated that he currently fishes about once every one to two weeks. AR 83–84. Franks also indicated that he gardens and works on his lawn. AR 1120. He uses a stationary bike and will walk short distances for exercise. *Id.* He is able to dress himself, bathe independently, prepare simple meals, load the dishwasher, wash his clothes, conduct basic yard work, occasionally mow the lawn, drive, shop, and take care of his cat. AR 78, 79, 754. According to the ALJ, these abilities further eroded Franks's credibility. While it is true that engaging in daily activities does not necessarily constitute substantial evidence that the claimant has the ability to work, "his credibility regarding subjective complaints of pain or other mental impairments can be undermined by daily activities." *Schmid v. Astrue*, No. 11-cv-784, 2012 WL 763571, at *20 (D. Minn. Feb. 10, 2012); *see also Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001) ("Inconsistencies between subjective complaints of

26

pain and daily living patterns diminish credibility.").

Finally, other medical professional indicated that Franks's allegations of pain were not supported by the record as a whole. *See* AR 764 (Dr. Niemoija stated that Franks alleged symptoms and limitations that were greater than what was consistent with evidence in his medical records); AR 779 (Dr. Johnson stated that Franks's reports of his pain symptoms were only partially credible, as Franks described daily activities that were not significantly limited in relation to his alleged symptoms).

Therefore, substantial evidence exists in the record for the ALJ to find the claimant's statements concerning the "intensity, persistence, and limiting effects" of his symptoms not credible. *See* AR 43. The fact that the ALJ did not directly address Franks's work history in her credibility determination is not sufficient to remand the case. *See Fedje*, 2002 WL 537648, at *2 (D. Minn. Apr. 9, 2002) ("Silence on [plaintiff's work history] does not require reversal of the ALJ's decision if other substantial evidence on the record supports the ALJ's decision.").

### 2.     The ALJ's consideration of credibility factors pursuant to SSR 96-7p

Franks also contends that the ALJ erred in assessing his credibility by not considering numerous factors under SSR 96-7p, such as the nature, location, onset, duration, frequency, radiation, and intensity of any pain; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side-effects of any pain medication; treatments other than medication for pain relief; functional restrictions; and the claimants daily activities and work record. ECF No. 15, at 15. The factors set out in SSR 96-7p are virtually the same as those set out in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See Maselter v. Astrue*, No. 07-cv-2921, 2008 WL 4527828, at *24 (D. Minn. Sept. 29, 2008) (stating that the *Polaski* factors are the same as those found in SSR

96-7p). It is well-established, however, that the failure to address each of the *Polaski* factors separately does not by itself render the ALJ's determination invalid. *Maselter*, 2008 WL 4527828, at *25 (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ was not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [the claimant's] subjective complaints.")).

As stated above, the ALJ articulated specific and valid reasons for finding certain claims by Franks not credible. *See Finch v. Astrue*, 547 F.3d 933, 935–36 (8th Cir. 2008) ("[Q]uestions of credibility are for the [ALJ] in the first instance. If an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment."). Therefore, Franks's claim that the ALJ failed to consider the factors articulated in SSR 96-7p is without merit.

### 3.    The ALJ's consideration of Franks's possible drug dependence was harmless

Finally, Franks claims that the ALJ erred in assessing his credibility by "attacking [him] with baseless and offensive insinuations of drug dependence." ECF No. 15, at 14. In her opinion, the ALJ stated:

> Treatment notes indicate that the claimant may have some issues with opiate dependence as he has been taking medications for so long for his alleged pain. [AR 1110.] Although there is no documented history of abuse or drug seeking, this possible dependence does impact the claimant's claim for benefits in light of his credibility. While I acknowledge that the claimant has had some significant musculoskeletal issues, any dependence on such drugs does serve to erode the credibility of the claimant's ongoing allegations.

AR 43. Although Franks claims that this observation was baseless, Franks's medical records indicate that at least one doctor reported "chronic opioid dependence." AR 1110. Dr. Rudd, while conducting a consultative examination of Franks at the request of Dr. Wilt, indicated that Franks had "chronic

28

opioid dependence for over a decade." *Id.* Similarly, Dr. Rudd also stated, "Patient has managed his chronic neck/shoulder pain with physical therapy/chiropractic, but also medications. He has been chronically opioid dependent over the last decade. This included Vicodin and later oxycodone. He has also taken diazepam versus soma." AR 1111. Therefore, the ALJ's statement that Franks may have some drug dependence issues was not baseless.

However, drug dependence due to legitimately prescribed medications is likely insufficient to discount a claimant's credibility. *See Preslicka v. Astrue*, No. 07-cv-4237, 2009 WL 490014, at *15 (D. Minn. Feb. 26, 2009) ("Although drug-seeking behavior may affect a claimant's credibility if he seeks the drugs for recreational use, . . . the same conclusion does not follow if a claimant develops drug dependence to a medication legitimately prescribed by a physician for treatment of severe pain."). Regardless, even without considering Franks's possible drug dependence, the aforementioned inconsistencies in the record regarding Franks's allegations of pain (e.g., the extent of Franks's daily activities, Franks's examining physicians' opinions, the consulting physicians' opinions, etc.) provide substantial evidence for the ALJ to find Franks's subjective statements concerning the intensity, persistence, and limiting effects of his symptoms to be not credible. Franks has not provided any evidence that the ALJ would have rendered a different credibility determination had the ALJ not considered his possible opioid dependence. *See Byes v. Astrue*, 687 F.3d 913, 917 (9th Cir. 2012) ("To show an error was not harmless, [the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred."). Therefore, the Court finds substantial evidence in the record to support the ALJ's credibility determination.

## V. CONCLUSION

If the ALJ's decision is supported by substantial evidence on the record, this Court cannot reverse simply "because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently." *Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000). Here, substantial evidence supports the ALJ's evaluation of this case under Listing 1.04, the claimant's RFC, and the claimant's credibility. Accordingly, the Commissioner's motion for summary judgment should be granted.

## VI.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (ECF No. 14) be **DENIED**;

2.      Defendant's Motion for Summary Judgment (ECF No. 17) be **GRANTED**;

3.      The Commissioner's decision be **AFFIRMED** and the case **DISMISSED WITH PREJUDICE**.


DATED: November 20, 2014                    *s/Franklin L. Noel*
                                            FRANKLIN L. NOEL
                                            United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **December 4, 2014**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.